UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DEBORAH WALSH,

                Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

No. CV 05-341-MO

OPINION AND ORDER

**MOSMAN, J.,**

      In this case, the Commissioner of the Social Security Administration ("SSA") denied plaintiff Deborah Walsh's applications for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act finding her not disabled. In doing so, the Administrative Law Judge ("ALJ") rejected Ms. Walsh's alleged fibromyalgia impairment at Step Two of the sequential analysis and also rejected her subjective testimony about her condition. Exercising jurisdiction under 42 U.S.C. § 405(g), I have conducted a thorough and careful review of the record and find the ALJ erred in both respects. As such, I REVERSE the Commissioner's decision and REMAND FOR FURTHER PROCEEDINGS under sentence four of 42 U.S.C. § 405(g).

### I. BACKGROUND

**A.    Administrative History**

      Ms. Walsh filed her application for SSI on February 11, 2002 and her application for DIB

PAGE 1 - OPINION AND ORDER

on March 22, 2002. Her alleged disability onset date is January 3, 2001. The ALJ held a hearing on August 26, 2004, where Ms. Walsh was represented by counsel. Both Ms. Walsh and Vocational Expert ("VE") Paul Morrison, testified at the hearing. The ALJ issued his decision denying Ms. Walsh's applications on October 25, 2004. This became the Commissioner's final decision on January 12, 2005, when the Appeals Council denied review.

### B.   Ms. Walsh's Testimony

Ms. Walsh was 53 years old at the time of the hearing. She has not worked since her alleged onset date, when she went on work disability. Ms. Walsh testified she is significantly limited in her physical activities as a result of pain throughout her body and problems with depression and anxiety. Specifically, she stated she can no longer cook, do laundry, drive a car, or garden. She has trouble using her arms and hands and has to "keep things down as low as possible." Though she has "good days," at least twice a week she spends most of the day in bed and is essentially unable to function. Even on her good days, she can only get out of bed for a few hours at a time and she has trouble standing for longer than about 20 minutes. Ms. Walsh also testified she was taking eight medications, which impact her ability to function. She has panic attacks two to three times a month, and crying spells a couple times a week. She also has trouble concentrating and remembering things.

### C.   Lay Witness Testimony

Ms. Walsh's life partner, Doreen Buller, also described Ms. Walsh's condition, essentially reiterating Ms. Walsh's allegations. She stated Ms. Walsh experiences significant pain that prevents her from walking more than 20-30 feet without a rest, lifting more than two pounds, and performing numerous daily living activities like cooking, shopping, most housekeeping chores,

and driving. She also stated Ms. Walsh has trouble concentrating and remembering, which impacts her ability to have telephone conversations, monitor medications, handle finances, and enjoy recreational activities like reading books and watching movies.

### D.      Medical Evidence

The medical record in this case is extensive. It is clear that from the mid to late 1990's Ms. Walsh began having problems with chronic pain and depression. In Fall 1998, she had an Independent Medical Examination ("IME") performed by Dr. Shabi Khan, focusing on her physical condition, and an IME performed by Dr. Mohinder Kaur, focusing on her psychological condition. Ms. Walsh reported to Dr. Khan that she could not drive and could only "sit comfortably for 20 minutes, stand for 1/2 hour, and walk 2-3 blocks." R.[1] at 198. Dr. Khan concluded Ms. Walsh was limited to light work due to problems with her right arm and shoulder, and that Ms. Walsh's "report [wa]s relatively internally consistent." R. at 200. Regarding her mental condition, Dr. Kaur concluded Ms. Walsh's GAF was 65 and that she could remember and carry out simple instructions and perform repetitive tasks. R. at 211. Dr. Kaur also concluded "concentration, persistence, and pace" were not significantly impaired and that she had a good prognosis as she responded well to medication. R. at 212.

Around this time, Ms. Walsh's mental health care provider filled out a disability questionnaire where she indicated Ms. Walsh's concentration was "slightly distracted," her memory was "normal," but her mood was "depressed." R. at 399-400. The provider also stated Ms. Walsh could manage her own funds and after starting medication her condition had improved. R. at 401. However, as a result of the pain Ms. Walsh was experiencing, the provider

---

[1]Citations to the official administrative record are referred to as "R."

PAGE 3 - OPINION AND ORDER

indicated she was not capable of working. R. at 402.

The agency also analyzed Ms. Walsh's physical and psychological condition in the late 1990's. The physical residual functional capacity ("RFC") assessment concluded Ms. Walsh had some postural limitations and lifting limitations, but that she could stand/walk and sit for six hours in an eight hour day. R. at 202. The psychiatric review concluded Ms. Walsh did not have any functional limitations due to her mental condition. R. at 220.

Dr. Cousino treated Ms. Walsh for various ailments. In 1997, she was originally referred to him for a work-related knee injury, and he performed knee surgery. R. at 380, 386. Dr. Cousino concluded this injury did not result in disability. R. at 375. In 1998, she was again referred to him for her chronic shoulder pain, and he again performed surgery. R. at 346. Finally, in January 2001, Ms. Walsh's family physician placed her on disability for carpel tunnel syndrome and referred her to Dr. Cousino. R. at 338. In a letter dated January 26, 2001 to the referring physician, Dr. Cousino stated: "I have known [Ms. Walsh] for awhile. She is certainly a handful but I think her symptoms are probably very real with the carpel tunnel syndrome. . . . I think it is pretty imperative that [she] get back to work so that she doesn't continually worry about her physical problems." R. at 339. Ultimately, Dr. Cousino diagnosed "moderate" right and "[b]orderline" left carpel tunnel syndrome, R. at 337, and once again performed surgery. R. at 329. Ms. Walsh was on disability while she recovered from this surgery, but Dr. Cousino stated she could "[r]eturn to unrestricted work as far as her carpel tunnel is concerned on 8/1/01." R. at 326.

Ms. Walsh also received treatment at Sutter Medical Center. In 1998, Dr. Gaskie diagnosed depression, carpel tunnel syndrome, and thoracic outlet syndrome manifested by

PAGE 4 - OPINION AND ORDER

severe right shoulder pain and placed Ms. Walsh on disability for a period of time. R. at 310, 314, 319. In 2000, Ms. Walsh was treated for chronic pain, depression, and GERD, among other things. R. at 267-69. In 2001, an MRI was ordered in relation to Ms. Walsh's chronic foot and ankle pain complaints. R. at 272, 288. The test found "the presence of ligametous and facet hypertrophy at L3-4 produces mild central canal stenosis. There is only a minimal narrowing of the neural foramina at this level, and no evidence of impingement upon the existing L3 nerve roots." R. at 288. In 2002, Dr. Bennett indicated a "[p]ossible rotator cuff pathology or impingement" as well as a history of "bulging cervical disk possibly persistent with radiculopathy." R. at 278. An MRI was performed revealing "L3-4, L4-5 stenosis," and she was given an epidural steroid injection. R. at 248-49.

In mid 2002, Ms. Walsh moved from California to Oregon and began receiving treatment at River Road Medical Group in Eugene. Initially, she sought pain management treatment, and Dr. Bigley diagnosed "[s]houlder impingement syndrome of the left shoulder." R. at 391. Ms. Walsh was also treated for depression, hiatal hernia, GERD, and "[p]ossible fibromyalgia." R. at 394-95.

Around this same time, the agency again conducted a physical and psychological assessment of her condition in connection with her current disability application. In the physical assessment, the reviewing physician concluded Ms. Walsh has some lifting restrictions but can stand/walk and sit for six hours in an eight hour day. R. at 424. Some upper extremity limitation were also indicated, including pushing, pulling, and reaching over head, as well as some postural limits as a result of left shoulder impingement and mild central stenosis L3-4. R. at 426-27. The psychological assessment concluded Ms. Walsh has a non-severe affective disorder (depression)

PAGE 5 - OPINION AND ORDER

that only mildly limits her daily life activities, social functioning, and concentration. R. at 407, 410, 417. Additionally, the reviewing physician talked with Ms. Walsh on the phone several times "w/no observations of any problems w/memory & concentration." R. at 419. The reviewer indicated Ms. Walsh's credibility was not an issue regarding her mental impairments. *Id.*

Ms. Walsh began seeking treatment with Dr. Crandall in late 2002. Dr. Crandall diagnosed GERD, spinal stenosis, depression, thoracic outlet syndrome, bursitis, and possible fibromyalgia. R. at 450. Dr. Crandall recognized Ms. Walsh had never been "formally diagnosed with fibromyalgia," but began treating for this condition, R. at 447, and in late 2003 indicated: "All trigger points noted for fibromyalgia positive with mild tenderness." R. at 467. Dr. Crandall referred Ms. Walsh to a rehabilitation specialist, Dr. Hook, who stated Ms. Walsh's pain was consistent with fibromyalgia, though he could not "really confirm" the diagnosis. R. at 477. Dr. Hook also stated that many of Ms. Walsh's complaints, including fibromyalgia, "are problems that are worsened by the person giving into the symptoms of pain and allowing themselves to become less active." R. at 478. Ms. Walsh also had an MRI around this time indicating "[m]ild-to-moderate degenerative changes . . . in the L3-4 inner facet joints. There is no focal disk extrusion or protrusion. There is no evidence of spinal stenosis." R. at 506.

Finally, in 2004, Ms. Walsh began receiving treatment at Kaiser Permanente in Portland. Ms. Walsh was diagnosed with chronic pain, depression, fibromyalgia, and tendinitis, among other things. R. 515, 521, 540.

## II.  STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate the

PAGE 6 - OPINION AND ORDER

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The Commissioner must conduct a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. Each step is potentially dispositive. At Step One, the claimant is not disabled if it is found he is engaged in substantial gainful activity. *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 404.1520(a)(4)(i). At Step Two, the claimant is not disabled if he has no "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(a)(4)(ii). At Step Three, the claimant is disabled if his impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(a)(4)(iii). The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's RFC. The claimant's RFC is an assessment of the sustained, work-related activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. § 404.1545(a); *see also* Social Security Ruling ("SSR") 96-8p. At Step Four, the claimant is not disabled if the Commissioner finds he retains the RFC to perform his past work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(a)(4)(iv). If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in the national economy. *Yuckert*,

482 U.S. at 141-42; 20 C.F.R. § 404.1520(a)(4)(v).  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  The court must weigh all of the evidence to determine whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F.3d at 1039-40.

### III.  THE ALJ'S DECISION

The ALJ employed the five-step process detailed above.  At Step One, he concluded Ms. Walsh has not performed any substantial gainful activity since her alleged onset date.  R. at 15. This is not contested.

At Step Two, the ALJ concluded Ms. Walsh's knee and ankle problems, thoracic outlet syndrome and impingement syndrome associated with her right shoulder, carpel tunnel syndrome, hiatal hernia, GERD, and depression are not "severe" within the meaning of the

Regulations, R. at 16, but that her left shoulder impingement syndrome and chronic low back pain are severe. R. at 17. The ALJ's exact conclusion about Ms. Walsh's spinal stenosis, disc bulging, and fibromyalgia is not clear, but he did not consider these conditions at Step Three so it appears he found they are not "severe." This conclusion is contested.

At Step Three, the ALJ considered only Ms. Walsh's left shoulder impingement and chronic low back pain, those conditions he found were "severe," and concluded they are not "'severe' enough to meet or medically equal, either singly or in combination," the impairments listed in Regulations. R. at 17. In particular, the ALJ considered listing 1.02 concerning impairments of the major peripheral joints and listing 1.04 concerning spinal disorders. *Id.* This conclusion is contested.

In assessing Ms. Walsh's RFC, the ALJ concluded her "allegations as to the existence of her symptoms are only partially supported by the medical record." R. at 18. Recognizing much of the medical evidence failed to address Ms. Walsh's specific physical limitations as opposed to her general diagnoses, the ALJ relied primarily on the agency RFC assessments performed in 2002, and concluded she "retains the functional capacity to perform light, unskilled work requiring only occasional pushing and pulling with her upped extremities, occasional use of ladders, ropes or scaffolds, occasional crawling and occasional reaching." R. at 19. This finding is contested.

At Step Four, the ALJ relied on the VE's testimony and concluded Ms. Walsh is unable to perform her past relevant work. *Id.* This conclusion is not contested.

Finally, at Step Five, the ALJ found that considering her age, educational background, lack of transferable job skills, and physical limitations, Ms. Walsh could perform a limited range

PAGE 9 - OPINION AND ORDER

of light work. R. at 20. In particular, the ALJ accepted the VE's testimony that Ms. Walsh could work as a charge account interviewer, a library clerk, or a small parts assembler, all of which exist in significant numbers in the national economy. *Id.* Thus, the ALJ concluded Ms. Walsh is not disabled. This conclusion is contested.

### IV. ANALYSIS

Ms. Walsh argues the ALJ erred in assessing her RFC by failing to sufficiently consider all of the evidence and all of her impairments. In particular, she asserts the ALJ (1) erred at Step Two in finding her fibromyalgia was not severe, (2) improperly rejected her testimony, (3) improperly rejected other medical evidence from treating physicians documenting her pain, and (4) improperly rejected lay opinion testimony. Because I agree the ALJ erred in rejecting fibromyalgia at Step Two and in rejecting Ms. Walsh's testimony, I remand for further proceedings on this basis and do not specifically address her other arguments.

1.) <u>Step Two – Fibromyalgia</u>

At Step Two, the ALJ must assess whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41. The claimant bears the burden at this stage of the analysis. To satisfy this burden, she must produce evidence establishing a medically determinable impairment or impairments. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005). A medically determinable impairment "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); SSR 96-4p. Where such an impairment is shown to exist, the ALJ must assess whether it is "severe" within the meaning of the Regulations. The

PAGE 10 - OPINION AND ORDER

Ninth Circuit recently explained that an impairment can only be found *not* severe where "the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation marks and citation omitted).  Where it is unclear what impact the impairment has on the claimant's basic work activities, "'the sequential evaluation should not end with the not severe evaluation step.'" *Id.* at 687 (quoting SSR 85-28).  Rather, the ALJ has an affirmative obligation to develop the record.  *Id.*  It is only proper to end the analysis at Step Two where the medical evidence clearly establishes the impairment is not severe.  *Id.*

Fibromyalgia presents some difficulty in this analysis because there are no clearly established tests or methods for diagnosing this condition.  *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004).  Apparently, "the only symptom that discriminates between it and other syndromes and diseases is multiple tender spots, . . . eighteen fixed locations on the body that when pressed firmly cause the patient to flinch."  *Id.*  And the diagnosis often involves the physician's interpretation of the patient's symptoms, unlike other conditions that are established by more objective criteria.  *Id.*  In spite of this, the Ninth Circuit has held fibromyalgia is medically determinable.  *Benecke v. Barnhart*, 379 F.3d 587, 594 (2004) ("The ALJ erred by effectively requir[ing] 'objective' evidence for a disease that eludes such measurement.") (internal quotation marks and citation omitted).

Here, several of Ms. Walsh's treating physicians suggested she suffers from fibromyalgia. For example, Dr. Crandall, though recognizing she had never been formally diagnosed, began treating Ms. Walsh for this condition, and indicated "[a]ll trigger points noted for fibromyalgia positive with mild tenderness." R. at 447, 467.  Likewise, Dr. Hook stated Ms. Walsh's pain

indication was consistent with fibromyalgia. R. at 477. Ms. Walsh was also diagnosed with and treated for fibromyalgia by her physicians at Kaiser Permanente. *See* R. 515, 521, 540. Given the nature of this condition, this evidence is sufficient to establish a medically determinable condition. *Benecke*, 379 F.3d at 594; *see also* SSR 99-2p (establishing "the presence of positive tender points" for an extended period is a medical sign establishing the existence of a medically determinable impairment).

Apparently, the ALJ concluded Ms. Walsh's fibromyalgia is not severe. *See* R. at 17-18. The medical record is not clear as to which of Ms. Walsh's symptoms are associated with fibromyalgia. Common symptoms of fibromyalgia include "generalized pain and multiple painful regions . . . . Sleep disturbance, fatigue, and stiffness." *Jordan*, 370 F.3d at 872 (quoting Frederick Wolfe, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia*, 33 Arthritis and Rheumatism (No. 2) 160, 170 (February 1990)). There is evidence in the record that Ms. Walsh suffers from these types of symptoms; however, the record is not clear as to what impact they have on Ms. Walsh's ability to work, as opposed to her symptoms associated with other impairments. As such, the ALJ's decision that fibromyalgia "has no more than a minimal effect on [Ms. Walsh's] ability to work" is not supported by substantial evidence. *Webb*, 433 F.3d at 686. "[A]n ALJ may find that a claimant lacks a medically severe impairment . . . *only* when [t]his conclusion is clearly established by medical evidence." *Id.* at 687 (internal quotation marks and citation omitted) (emphasis added). Such clarity is not present here. Thus, a remand for further proceedings is necessary to allow the ALJ to perform his obligation of fully developing the record on this point. *Id.* ("the ALJ had an affirmative duty to supplement [the] medical record, to the extent it was incomplete, before

rejecting [the claimant's] petition at so early a stage in the analysis").

2.)   Ms. Walsh's Testimony

Ms. Walsh also argues the ALJ erred in rejecting her testimony about her pain and physical limitations. The ALJ must consider a social security claimant's subjective pain allegations where the claimant produces objective medical evidence of an impairment that is reasonably likely to cause the symptoms alleged. *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc). Where such evidence is produced, the claimant's testimony cannot be rejected "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Id.* at 345.

Here, the ALJ concluded Ms. Walsh established the existence of "severe impairments that could reasonably be expected to produce some of the symptoms she alleges," but he rejected her testimony stating it was not "sufficiently credible to serve as additive evidence to support a finding of disability" because it was "not supported by the objective medical findings or any other corroborating evidence." R. at 18. This was clearly in error, and on remand, the ALJ must consider this evidence.

## V. CONCLUSION

By improperly rejecting fibromyalgia at Step Two, the ALJ significantly altered the analysis in this case. Many errors concerning the treatment of the medical evidence and the ultimate conclusion of whether Ms. Walsh is disabled or not flow from this decision. As such, the ALJ is directed to essentially start over on remand by further developing the record concerning whether Ms. Walsh's fibromyalgia is "severe," as defined in this opinion. Further, the ALJ is free to develop the record concerning the impact all of Ms. Walsh's medically

PAGE 13 - OPINION AND ORDER

determinable impairments have on her ability to work, and to fully reassess the evidence in this case in light of any additional evidence produced. The Commissioner's decision is REVERSED and REMANDED for further proceedings under sentence four of 42 U.S.C. § 405(g).

DATED this   26th   day of June, 2006.

                    /s/ Michael W. Mosman
                    MICHAEL W. MOSMAN
                    United States District Court